S. S. Boyd,
(one of the judges appointed to determine the cause,) delivered the opinion of the court.
The bill in this case was filed by the complainants in the superior court of chancery at the last July term, for the purpose of quieting their title to a tract of ground designated as “ commons” and “ Levee street,” on the recorded plat of the town of Vicksburg, and to enjoin and restrain the defendants from prosecuting several actions of ejectment, then pending in their favor, against the complainants in the circuit court of Warren county, for the recovery of the same tract.
A perpetual injunction was also prayed for, to prevent the defendants from proceedingfurther to erect permanent buildings, ware houses, and store rooms on the premises, to the common nuisance of the citizens of Vicksburg and the public. The title to this strip of land, lying between the front row of lots and the Mississippi *427 river, and to the easement therein, and the use thereof, is claimed in the bill to be vested in the complainants as trustees and representatives of the rights and interests of the citizens of Vicksburg, by virtue of several acts of dedication, and the statutes of the state, constituting them a body politic. The answers of the defendants, denying any dedication of the property in controversy, and setting up affirmatively, their claim to it, under Newit Vick directly, or by derivative title, thus tracing their rights and interests, whatever they might be, to the same source with the complainants, narrowed the inquiry before the chancellor to a single question. The ultimate right of fee was not in controversy. Neither the full assertion of their fiduciary character, and the establishment of the easement by the complainants, nor the complete vindication of the acts of the defendants, in erecting the buildings and nuisances complained of, and in prosecuting their actions of ejectment, involved the decision of that point.
Indeed, the right to the fee might be decided to be in the appellants, in perfect consistency with all the claims set up in the bill, on behalf of the appellees. The easement is bufan incumbrance, and, if properly shown to exist, may be perpetual.
Both parties rested their title on Newit Vick, and recurred to him, as its only source: and the case, thus presented, leaves his estate, real and personal, as it stood at the time of his death, except so far as he had diminished or abridged it. It passes to his heirs general, unless that disposition is altered by devise: it passes absolute, and untrammelled, except by his act. The complainants, then, in order to have succeeded before the chancellor, in the prayer of their bill, must have shown that those whom they im-pleaded, had no just right to do the acts complained of; because those acts were inconsistent with the rights acquired by them, through their ancestor. So far as this controversy was concerned, the defendants, had, at all times, absolute and full right of possession to all the estate of Newit Vick, after his death; unless those who demanded the interposition of the court, could show a restriction or abridgment by him, of that right. This was the situation of the case, as it was presented to the chancellor; and, in granting the prayer of the bill, he, in effect, decided that the estate *428 of Newit Vick, or that part of it embraced in the recorded plat of the town, was encumbered with an easement to the extent claimed in the bill, and that a perpetual right of possession to the “commons” and “ Levee street,” in opposition to the appellants, existed in favor of the appellees, as trustees, for the use of the citizens of Vicksburg.
The same points are now before us, on this appeal. And we are to decide, whether complainants have shown a case sufficient to prevent the defendants from asserting their title, by devise, from Newit Vick, to that portion of his estate here in controversy.
Their claim is of an incorporeal hereditament; a perpetual in-cumbrance or easement; and that claim is based upon the ground of a dedication, or appropriation for their benefit.
This dedication is alleged to have been made in various ways. As to that portion designated as “ commons,” in contradistinction from “ Levee street,” the acts of Newit Vick, in his lifetime, and of John Lane, as administrator, with the will annexed, are relied on as the foundation of complainant’s title. In regard to what is known as “ Levee street,” the claim of the easement is rested partly upon the proceedings of commissioners appointed by the probate court of Warren county, and partly upon the acts of Lane, as administrator, and of the heirs and devisees of the testator.
We do not consider these distinctions and divisions of much importance, except so far as they may aid in arranging and simplifying the various proofs, exhibits and pleadings, in the cause. The acts of dedication, if they exist, must, in order to affect the rights of the defendants, connect themselves with their ancestor, or proceed from themselves. The executor of Newit Vick, the administrator with the will annexed, and the commissioners of the probate court, in their appropriate spheres, represent the testator. Their acts are his acts, and his heirs and devisees cannot gainsay them. Their own acts stand upon the same footing; and they may also adopt or ratify what has been done by others, and thus make it their own, so as to be bound by it.
The questions, then, resolve themselves into these: — Has there *429 been a dedication of the easement in question, by Newit Vick or his authority, or by the defendants themselves?
The common law rules, in reference to the acquisition of real property, and the rights and interests of a permanent kind, growing out of land, have been materially modified and relaxed by a long train of decisions, connected with the subject of dedication. A direct act of dedication would probably still require a deed or writing. 3 Kent, 434. And the act, of whatever character it may -be, by which the public right is claimed, must come from the owner of the fee; 4 B. & C. 574; 1 Str. 999; 5 B. & A. 454. And it must be done openly, and with a deliberate purpose. 1 Campbell, 262; 1 Greenleaf, 111.
Something of inaccuracy and confusion will be found in most of the American decisions, when an attempt is made to draw the distinction between express and implied dedications. The proof of a dedication to public or charitable purposes, may be of various grades. The terms “ implied,” or “ by implication,” should more properly refer to the testimony, or grades of evidence than to the fact to be proved. Prescription supposes a grant, and may amount to one, for all legal purposes; 3 Kent, 452. So a grant may be presumed, from circumstances inconsistent with any other supposition, and which estop the grantor, by matters in joats, from denying it; 6 Peters’s S. C. Rep. 439; Co. Litt. 56.
These remarks may serve to give greater certainty to our inquiries, as to what acts will be sufficient to establish the fact of a dedication of “ commons” or highways to public use.
For that purpose, a deed, or written grant, is certainly not required; 2 Strange, 1004.
Nor is it necessary that there should be a grantee in existence, to take the fee, out of which the incorporeal hereditament is to arise, at the time of the supposed dedication.
The authorities to this last point are numerous, and have been carefully examined by the court; they introduce a máterial deviation from the general principles of the common law; which would require a grantee in all such cases. The whole doctrine of contracts and grants, is based upon the idea of parties capable of contracting; and although in reference to the public, and their *430 claim to easements in land, a looser rule has been adopted, yet the relaxation is not considered to go to the extent, that there can be a dedication or grant, without some party beneficially interested in it, besides the grantor.
The reason of the rule will fix its limits. In the case of Beatty v. Kurtz, 2 Peters’s S. C. Rep. 256, the dedication was for aburial place for the Lutheran church. It appeared that there never was, down to the time of the suit brought, any such incorporated church; but the society beneficially interested, had always used the ground as a burial place, from the time of the dedication. In 9 Cranch, 292, a similar state of facts was shown. And, in both cases, the want of a grantee was not suffered to defeat the interests of those beneficially interested. Public considerations were held to support the grant in favor of the beneficiary.
The decisions may be sustained on the ground that the proprietor should be estopped from asserting any claim, so long as the land remained in public use, or that no absolute divestiture of the fee was necessary to support the use; and, in either case, the enjoyment of the easement would remain perpetual.
The laying out of a public highway in the country, presents the same view. The land owner may be considered as estopped by his act of laying out the road, from interfering with the public right of passage and travel. Or he may be regarded as holding the fee, encumbered by his acts of dedication; and the general claim of the citizens can be sustained. The amount of the decisions seems to be, that the interests of those beneficially entitled to easements or dedications of a public, or charitable or religious character, will not be permitted to lapse or fail, for want of what is technically called a person, to take the legal title. The rule is expressly in favor of the equitable or beneficial claimant. It is iiltend-ed to support and defend his interest. He is the favored party, in the view of the law, and receives its peculiar regards. For his benefit, the strict principles applied to similar transactions with individuals, are departed from, “ and adapted to the nature and circumstances of the case, to carry into effect the object of the grantor, and to secure the benefit held out and expected to be derived from and enjoyed by the dedication;” 6 Peters’s S. C. Rep. 435. The public, *431 sustaining this favored relation, must be a material party to the act, out of which its interest is supposed to arise. Upon no other ground can its claim be based. If it should be held that there could be a valid grant, without a grantee, and, at the same time, be decided that there need be no other party to the transaction, legally or equitably interested, except the grantor, it would necessarily follow, that the fee simple title in land might be incumbered, or fully conveyed away, by an act beginning and ending with the owner of it. Connected with this, take the principle that the grant may, in favor of the public, be without deed; and a complete divestiture of the largest estate known in the law, might be brought about by the mere volition of an individual, or by words uttered only in Iris own hearing.
Such conclusions are not warranted by any just view of the settled laws of the country. No one can lessen his estate in land but by some act which gives a right to another. Parties are necessary, as well to a dedication, as to a private grant. The authorities already referred to, clearly sustain the view here expressed. It will be amply supported by those to which we shall give our attention, in examining the next point.
The necessary parties being established, let us now inquire by what acts, according to adjudged cases, the right by dedication maybe granted and acquired. The case in 11 Wendell, 487, decides several important principles. It was there held, that the recognition, by a proprietor, in the city of New York, of the plan of the city laying out his grounds into streets, was a dedication of the streets, to be taken for public use, whenever the corporation should think proper to open them.
All the grantees from the same proprietor were consideredto have an interest in all the streets, and that interest was supposed to extend to every person liable to be assessed. The sale of a single lot, it was said by the Chief Justice, adopted the map and appropriated the ground as streets, and without the sale of any lot, the operation of the statute, by compelling him to make the streets, effected the same thing. The whole transaction is likened to a contract; and in 19 Johns. Rep. 186,that contract is said to be, in effect, “I engage to give the ground for the streets, according to the map, *432 upon condition that the corporation shall ratify it.” The statute referred to is more fully noticed in 1 Wendell, 270, 271. It gives the corporate authorities the right to open the streets laid down on the city map by the commissioners, at the instance of three-fourths of the owners of lots, &c., and then regulates the assessment of damages. “ The streets until actually opened, are not regarded as highways, but the proprietors adjoining have a right of way over the lands of the grantor, from their lots to the public highways or streets.” In both of these cases, there had been sales of various parcels upon the tract of the proprietor, according to the city plat. Similar decisions, and depending upon the same considerations, are to be found in 2 Wendell, 472; and 8 Wendell, 85.
In Paige’s Reports, 513, these principles, as settled by the courts of law in the state of New York, are decided to be “ applicable to the case of a similar dedication of lands, in a city, or village, to be used as an open square or public walk.” The rule extracted from all the authorities above cited, is said to come to this, “ that when the owners of urban property have laid it out into -lots with streets and avenues intersecting the same, and have, sold lots with reference to such plat, it is too late for them to resume a general and unlimited control over the property, thus dedicated to the public.”
It is unnecessary to notice the points made or decided in the cases already briefly referred to, except so far as they are supposed to have a bearing upon the facts before, us; they abound in varied learning and ability, and give a clear view of all the rights of way, and easements, public and private, which grow out of the social system. The material point is, that the acts of a proprietor, within the limits of a city or village, of known and established boundaries, and 'peopled with inhabitants, by which a dedication may be established, must be either in themselves, or from the relation of the parties, of an open, palpable, deliberate, and public character.
The dedication, even, which is considered to rest on implication, such assent and user, sale at increased value, &c., requires that the testimony, or circumstances detailed in proof, which *433 evince the appropriation, should be of the same kind, and absolutely inconsistent, according to the rules of law, and the obligations of good faith, with any other supposition. It is but the general doctrine governing presumptions in law. 2 Bl. Com. 93; 2 Term Rep. 81; 3 Bac. Abr. 107; 2 Atk. 83; 2 Bay, 340; Cro. Eliz. 300; Math. Pres. Ev. 16, 17, note 3334 et seq. 4 Camp. 16.
A thorough examination of the principles connected with this part of the case, was made by the supreme court of the United States, in 6 Peters’s S. C. Rep. 432 to 444, and 498 to 514.
In the first of these cases, the facts in evidence were sufficient to warrant the presumption of an absolute grant. Ibid. 439. It was, however held, that no particular form was necessary in the dedication of land to the public use; it only required the assent of the owner, and the fact of it being used for the purpose intended. The proof was that there had been a plat publicly made and exhibited, at the time of laying out the land in controversy, and assented to by all the proprietors; the lots in every part of the tract, were sold by them in reference to that plat, and the square, or commons reserved, had been used, from the time of the settlement of the town, by the proprietors and public together.
The court based their decision on the ground, that the right in the easement depended on the same principles, as the right to the use of the streets by the public; and at page 43S, it is said, “no one will contend, that the original owner, after having laid out streets, and sold building lots thereon, and improvements made, could claim the easement thus dedicated to the public.”
In the case at page 438, of the same volume, the dedication claimed was placed on the grounds of declaration to the citizens, at the time of laying out the tract; the reservation by a plat then publicly made and exhibited; and a use, long continued by the public, so far as the convenience of the citizens required. The use, however, was not considered material, if the dedication were absolute. The whole town had been settled, and the lots improved, in reference to the plat by which the sales had been made, and in the continued presence of the person' dedicating; although the particular street, or common, had not been regularly *434 opened, and appropriated fully to its destined purposes, for many years.
These authorities strengthen and confirm the views already expressed, and they clearly illustrate who should be the parties necessary to every act of dedication, as well as the character of the act itself.
The principles and reasons of the same authorities also lead to another and most important conclusion, that the acts of individuals, wholly immaterial, and of no efficacy whatever in themselves considered, may acquire a strong and binding force, sufficient even to change the proprietorship and use of real estate, merely from the relations subsisting between the parties to such acts. Those relations may be the result of express contract, or of that accidental community of right and interest, which belongs to all organised societies, and arises from the presumed assent of the citizen to the laws, and municipal regulations, by which he acquires, holds and enjoys his property. We do not intend to quarrel with these decisions; but we are not disposed to extend their application. They have gone quite far enough in maintaining claims in favor of the public, against common right. 4 McCord, 98, and cases cited.
In pursuance of these views of the law, the drawing of a map, or. the recognition of one drawn by others, it has been seen, was held sufficient to bestow most important privileges. The implied acquiescence of the citizen, in the legislative and corporate enactments by which a portion of his real estate may have been brought, against His wishes and exertions, within the limits of a given city, or town, and the further presumption, as often false as true, that an individual in this situation, assents to the ordinances, by which land, thus forced from his own control, is surveyed and laid off, as the views and inclinations of others may direct, have been considered an ample warrant to deprive the •owner of large and valuable portions of his property. To these presumptions, all of them against the landholder, the law annexes one in his favor, and that is, that he will be presumed to have received an equivalent benefit, on an arbitrary and fancied *435 estimate of the increased value of the remainder of his estate; a value which he can seldom realise, but in a single way, by making his property a thing of barter and sale, and throwing it upon the sweeping currents of traffic and commerce, contrary, perhaps, to the most cherished and powerful attachments and associations of life. The decisions, however, are such as we find them; and rigid and harsh as they must frequently be, in their operation upon private rights, it is not our purpose here to attack their judicial weight and sanction.
Examined in the light of these adjudications, so favorable to the community at large, the supposed acts of dedication, or those evincing a dedication, by Newit Vick, will not bear the test of legal scrutiny.
The mere intentions of the proprietor cannot be made the subject of speculation, or the foundation of right by the complainants. The declarations made by him, of those intentions and designs, as they were, in every instance, private, and, with an unimport-» ant exception, to the single individuals who detail them in proof, can have no greater efficacy for that purpose.
His offer to sell to one of the witnesses, and refusal to sell to another, as they met him in the prosecution of his own views, upon his own premises, are of the same nature and legal effect. There was nothing of publicity about them; they were accidental, isolated, individual transactions; out of which no rights were created, even as between the parties to them.
The drawing of the plats, under the circumstances of the case, was an act wholly private, and of no moment whatever, in this controversy. The first one spoken of, was merely a sketch in pencil, showing the extent to which he had proceeded in running his lines. As he went on, in the midst of his own field, he drew another draft of his work, and, probably, his plats kept pace with his daily labors. No legal consequences whatever can proceed from such acts, in favor of the public, or of individuals. No obligations, or duties, on either side, could be predicated upon them. It is expressly proved that these occurrences were all private, though not, in the language of the witnesses, “ confiden *436 tial.” The very situation of the case shows that it must have been so.
Next; as to the sale of the lot on which Centre lived. Temple-ton swears positively, that Centre occupied his house and lot in the open field, “ before any lots were laid off, or the town commenced.” Walcott is uncertain upon the point; but Templeton is clear and explicit. Centre held by - sufferance, permission, or contract, with Vick; this is recognised in his will, and a conveyance is directed, when 300 dollars should be paid. This contract, whatever it may have been, was abandoned by Centre; and the premises, in pursuance of an understanding among the heirs, were conveyed to Hartwell Vick, or his children. The whole contract was one of private agreement, between Vick and Centre, before the commencement of the town; whether it had reference to the future city, never can be ascertained; but there were no interests connected with it, and growing out of it, except those of the contracting parties.
The last act relied upon, at bar, to show a dedication of the “ commons,” by Newit Vick, is the grant of lot No. 1, by deed to Rogers. The deed describes the lot as “ lying and being in the plat of the town called Vicksburg, on the Mississippi river, near the mouth of Glass’s Bayou; being the corner of Water and Centre streets.” The sale to Rogers must be considered in reference to the circumstances under which it was. made. The whole tract of 200 acres, which now constitutes the site of Vicksburg, was then a dilapidated and abandoned cotton field, or a wild, unsubdued forest. It was the sole property of Vick, wholly unoccupied, except by his tenant, Centre, and at a distance from any settlement. Rogers and Vick, at the time of the grant, stood alone, on the unpeopled banks of the Mississippi; and we know, nothing of their mutual understandings, conversations, or contracts, upon the subject, but from the deed, and the situation of the parties. The transaction was as private as the solitude of the wilderness could make it. What inferences, in this state of things, are to be drawn from the descriptive words in the deed?. In the first place, no particular plat is referred, to, and none is be *437 fore us, corresponding, in all its parts, with this, so imperfectly noticed in that instrument. Water street and Centre street are not designated on the city plat; and the drafts, spoken of by the witnesses, had no street, but a public common, in front of lot No. 1. But, passing by this irregularity or defect in proof, it is clear that Rogers purchased with a full knowledge of the situation of things at the time. Vick’s intentions were not fully developed, even to his own mind. He was progressing with them, from the time of his first rough sketch, till his death. They were his owii private plans and designs, liable to be altered, modified, and changed at pleasure, or to be interrupted and broken up by accident. That they were never consummated, is positively proved. The descriptive words in the deed, referring to the boundaries by streets not yet opened, could not, under such circumstances, import more than an implied covenant to allow the grantee a convenient right of way, in those respective directions, to the next market road, or highway. They created a rural, and not an urban servitude. 19 Johns. Rep. 181-8; 4 Mass. Rep. 589; 8 Wend. 98-9; Matthews’ Pres. Ev. 336.
Even that implied covenant might be wholly changed, against the wish of the grantee, as to the mere direction in which the right of way should extend, by matters subsequent to the grant. 19 Johns. Rep. 187.
Again, if the easement claimed could be created by force of the mere description in this private act, the same result would follow, if the deed had been a deed of gift. The consideration of 400 dollars gives no strength or additional force to the words.in question. That circumstance might raise an equity in favor of the grantee, but would not affect, in the slightest degree, the terms employed in the conveyance. The question here is as to -the legal import of those terms, and the supposed rights of the public, growing out of their use: and we are clear, that no right, of any kind, under the circumstances, can be predicated upon them, except in favor of Rogers, and that was a' mere right of way, and of no permanent, fixed, or immutable character. ....
The advanced price, paid by Rogers, was much relied on by counsel. It is not clear what was the inducement for the pur *438 chase. The witness thinks the lot was sold at a high price, by reason of it being a front lot; but whether he alluded to the advantage as coming from the front on the river, or the front of the contemplated city, is not stated. Judging from Rogers’s acts, subsequently, he considered the value to consist in the command which it gave him of the area between him and the bank; for he improved it in a way absolutely inconsistent with any public use whatever; and it continues thus improved, to this day, -under the authority of the complainants. But, whatever was his inducement to give that sum for the lot, was a matter wholly between him and his grantor; and, under the testimony, we see no reason to suppose that he could ever have laid claim to any thing more from Vick, than the performance of the dry-covenants of his deed. If he acquired other rights, they extended over the whole tract; for it was all open and unoccupied alike, and even the supposed lots were all used as a thoroughfare.
One other view of this part of the cause. — Is there any thing in the testimony, or the situation of the case, to show that Rogers could not have released to Vick, at any time before his death, all the privileges, appurtenances, rights, and easements, public or private, springing from the deed to him? Certainly not. There was nobody else there, to raise any question about it. This is conclusive on the point; it shows that the whole transaction, properly weighed, began and ended with Rogers and Vick. There were no parties to it, but themselves; there were none in a situation to be affected by it, either favorably, or unfavorably; and, of course, none who could claim any thing of benefit or advantage from it. Rogers acquired rights by it, and he alone. But the question made upon this point, has not been, what Rogers acquired, but what the public acquired; and the response to it comes up from every page of the record; — there was no public there, at that time, nor for two years after, to acquire any rights whatsoever, in reference to the subject. At this stage of the case let us pause, and inquire, where the supposed easement in question could have vested, after the death of Vick, and till the first sale of lots, in 1822, by John Lane? It would be difficult to answer the inquiry in terms compatible with its existence any where.
*439 We are satisfied the complainants cannot sustain themselves by a reference to the acts of Yick.
It remains to be ascertained, whether the dedication claimed has been made since his death, by his authority.
He appointed his wife executrix, and his son Hartwell Yick, and nephew Willis B. Yick, executors of his last will and testament. His wife died in a few minutes after him. Hartwell renounced, and Willis took out letters testamentary. The will contained a reservation of “ two hundred acres, on the uppermost part, of the uppermost tract, to be laid off into town lots, at the discretion of my executrix and executors.” He also enjoined it on his executors, to “ remember, that the town lots now laid off in the aforementioned two hundred acres of land, should be sold to pay my just debts and other engagements, in preference to any other of my property, for the use and benefit of all my heirs.” The only act of Willis B. Vick, bearing upon this matter, was an offer made by him to one of the witnesses, in reference to his taking some of the town lots in payment of a debt due from his testator. The offer was refused, a\id like a similar transaction with Newit Yick, was of no legal moment whatever.
We come next to the proceedings of John Lane. Can they be connected with any authority derived from Newit Vick?
John Lane was appointed administrator with the will annexed, at the October term, 1821, of the probate court of Warren county.
All his power was derived from that appointment. Was it legal?
The only authority of the probate court to grant letters of administration with the will annexed, is to be found in the special enactment of the statute. Turner’s Digest, p. 443, sec. 27. It is an express limited authority, and extends to two cases only. First, where the executor refuses to render an account. Secondly, where he becomes insane. The section, of course, presupposes that the executor or executors have once qualified, and taken upon themselves, the trusts of the will. After that, the jurisdiction of the court depends upon the two events contemplated in the statute, and is bounded by them. The reco'rd must show the jurisdiction, *440 or,it does not exist. It is the general principle applicable to all inferior tribunals. In this case the order granting letters to Lane, was simply on his' own motion, and without cause assigned. So far as the record shows any thing, Willis B. Vick, the executor, was then acting in the discharge of the duties of his office. That fact is not material, however: the act appointing Lane does not state a case which gave the court jurisdiction, and it was therefore null and void. If .the facts had been stated, .their existence could not now be collaterally questioned, but a defect in jurisdiction may be noticed, whenever and wherever it appears. 6' Wheaton, 128; 8 Cranch, 21; 9 Pickering, 259; 2 Wils. 382; 1 Burr. 620; 1 Hayw. 414; 2 Peters’s S. C. Rep. 164; 1 Cooke, 194, 268; 1 Willes, 199; 1 Saund. 313; 1 Strange, 703; 2 Ibid. 102, 996.
• It is contended by counsel, that this defect is cured by the proceedings in evidence in the cause, showing, that Willis B. Vick was removed from office by an order of the superior court of Warren county, in September, 1821, reversing a decree of the probate court previously made. ' .
Neither the probate court, nor the superior court of the county, had any direct authority to remove an executpr for any cause. It was an incident to the power of appointment, which was exclusively delegated to the probate court. Certain acts were considered by the statute ' already referred to, as vacating the office of executor. There was no removal, except what was produced by the grant of the letters cum testamento annexo. This grant could alone come from the probate court, and, of course, any act of the superior court was without validity. The utmost the appellate tribunal could do, would be to reverse the decision of the inferior.
• But even if it be admitted, that the removal,'as an independent, and not an incidental act, might be made, it must still be for the same cause which' would justify the appointment.
And here again the jurisdiction must appear. That is not the case in regard to the judgment by which Vick was supposed to have been removed. It could have no weight. It was void.
Suppose it had appeared in the proceedings of the superior court, that the executor was removed for insanity, one of the *441 causes named in the statute; still, unless that matter had been embodied in the records of the probate court, and made the foundation of the order appointing Lane, the grant to him would have been a nullity. The probate court is not authorised to exercise its jurisdiction on the mandate of any other court, but only on the very cases and facts set forth in the legislative enactments on the subject.
In this part of the case, we have given to the complainants the full benefit of the state of facts supposed by them; though it would be difficult to show their existence, by any examination of the confused and unintelligible entries of the inferior courts whose records have been under review.
It is unnecessary to notice, particularly, the proceedings of Lane, in creating the easement claimed. They were ample for the purpose, if he had possessed the authority. The witnesses show clearly and beyond all question, that the first and only acts of dedication of the commons, were performed by Lane at his sale of lots, in 1822, under his fancied power as administrator. He did it solely in virtue of that power, and every one so understood it. He named the open space “ commons,” because “ he thought it might as well be called by that, as any other name,” and not because it was a “commons,” or had been made so byNewit Vick. He did not know the boundaries, direction or limits of the supposed easement, although the pretended grantor had been dead more than two years, and he stood in the relation to him of a son-in-law. The testimony on this point is particularly full, and wholly rebuts any jjjgsumption of a dedication by Newit Vick, attempted to be drawn from his intentions, declarations, or acts.
It was said, however, that the doings of Lane will be sanctioned on a well known principle in equity; because they were such as the executor would have been bound to perform, in the exercise of tiij|^ji£retion left to him by the will. 1 P. A. Browne’s Rep. 89.
The rule cannot be carried to such an extent. It will, at most, only sanction the acts of an intruder upon a trust, where they are for the benefit of the trust fund, as in discharge of liabilities, payment of debts of an estate, and the like. It will never permit a *442 stranger to experiment upon the discretion confided to an executor, by creating incumbrances, and parcelling out and selling real estate, and give validity to such proceedings on account of their supposed conformity to the wishes and designs of the testator. Heirs and devisees do not hold their rights by so feeble a tenure as this. Plowd. 282-3; 6 Coke, 30. b; 1 Lord Raym. 661; 7 Serg. & Rawle, 192; 4 Johns. Chan. Rep. 368.
The last ground of complainants’ claim, connected with Newit Vick, remains to be examined; and here it becomes important to notice several provisions of his will. It gave to his wife and children all his personal estate in equal shares; and made also a further provision for his wife. It then declares as follows: “ I will 'and dispose to each of my daughters, one equal portion with my •sons and wife, of all my personal estate, as they come of age, or marry, and to my sons one equal part of said personal estate, as they come of age, together with all my lands, all of which lands I wish to be appraised, valued and divided, when my son Wesley comes of the age of 21 years,” &c. &c. The clause of the will already quoted, in regard to the sale for the payment of debts, is the only other one to which it is necessary here to refer. It appears in evidence that Vick left nine daughters and four sons. John Henderson and Henry Morse, who had married daughters of Vick, petitioned the orphans’ court (Nancy Vick joining with them) for a division of the town lots, and an assignment of their respective shares. They state no grounds, except in the brief allegation, that they are entitled by the will. John Lane voluntarily appeared and answered the petition; and on his application, plenary proceedings were ordered, “ and the plaintiffs and defendant are directed to file their bill and answer at the next term of court.” Accordingly, Morse and wife, and Henderson and wife, at the July term, presented their bill, setting out their claim a little more at large, complaining of the course of Lane, and praying an allotment and division according to the statutes, and offering to give bond to refund, if it should become, necessary for the payment of debts. Lane’s answer denies their right to a division, and states “ his humble opinion to be, that it is a fair construction of the will, that the executors do sell the land, pay the debts out of *443 the proceeds of such sale, and then distribute the balance among the children, heirs of Newit Vick.” On argument and examination, the division was ordered, and Lane appealed to the court of chancery, where this decision was affirmed. Commissioners were thereupon appointed to make the allotment and division. Their report with the plat annexed, was returned, and approved by the orphans’ court. On this plat “Levee street” is left open as commons for the public, and this is the foundation of the claim to that portion of the easement.
The whole proceeding was based upon a wrong construction of the will. The daughters of Vick acquired no right by the devise to this land of their father. The clause, from which then-supposed interest arises, warrants no such inference. The sale of the town tract was only enjoined, in case it should be needed, for the payment of debts, &c. It was not an absolute direction to the executors to sell the land, but only to appropriate it in payment of debts, in preference to the personal estate. And this was considered to be for the benefit of all his heirs. One consideration renders this construction certain beyond all doubt. If Vick had died leaving no debts, there would’ not have been a shadow of authority in the will for selling any portion of the tract. And this was not an unreasonable provision, for he might have desired the town site to remain in the hands of those who bore his own name, and so have left it to his sons, and directed it to be kept together, till Wesley Vick became of age. At the same time, as he had made provision for his daughters out of his personal estate, and reflecting that his debts might exhaust that entirely, his parental affection overcame his aspirations for fame, as the founder of a city, and he ordered the town property to be disposed of, rather than that his daughters should be deprived of the means of a comfortable subsistence. The orphans’ court took a different view of the subject, and the inquiry is, whether the proceedings of the commissioners, acting under their authority, can bind these defendants. We think not. They were not parties to them. The petition and answer show, conclusively, that the contest was between Lane and the two heirs, who sought the assignment of their respective shares. They do not ask any *444 thing but the ascertainment of their own interests. Nor do they •name or allude to any other heirs, or devisees. It was their own claim they were pursuing, against the administrator who denied it. They refer to the new code just then enacted, and propose to give a refunding bond, as directed by the 91st and 92d sections on page 56, Revised Code, when a single distributee or legatee obtains his distributive share. It assumed the shape of a regular action in court, and the rules applicable to the one are applicable to the other. The parties concerned in it were bound and concluded by it, and no others. Rev. Code, page 61, sec. 112. These defendants were not only not parties to the contest, on the face of the pleadings, but they had no notice of it. Notice might perhaps have bound them, though their names did not appear in the petition or answer. It was said the act only required notice of the time and place of the meeting of the commissioners. The words of the section are certainly to that effect. But the first part of it declares the proceedings under it only conclusive on the parties concerned; by which we understand, persons before the court actually, or by return of process, or by publication. All such may properly be said to have had notice; or they may all come in, in the first instance, as petitioners, and this is probably the reason why the word notice is omitted in that portion of the sentence. Their interests aré sufficiently guarded by providing that they shall not be affected unless they are concerned in the controversy. The other notice, directed in the proviso, is intended as a double protection, so that all whose rights may be involved, can attend, even at the comparatively unimportant matter of the surveying and running the lines of the different shares. In addition to this, the 9th sec. of the probate act, gives the power to the court, and of course enjoins the exercise of it to summons and enforce the appearance of any person whose appearance in court shall be deemed necessary and proper for any purpose. That provision would, of itself, be conclusive on the matter.
The proceedings for the division of real estate under the direction of the probate court, are said to' be proceedings in rem, and therefore binding on all the world. The designation will not alter the nature of the transaction. They are special, statutory pro *445 ceedings, and must be governed wholly by the statutes authoris-ing them. Like the attachment law, or the general act in relation to partition, of lands, they are wholly creatures of legislative enactment. But even in cases properly denominated suits, or actions in rem, the very reason why they are of such unlimited and universal obligation is, that all persons are supposed to have notice, and so may make themselves parties. This is by publication, citation, or monition in attachments, libels in admiralty, and the like. It is of no consequence what form of process, or summons, may be adopted or required. The legislature has a full right to give its own definition of notice, and when the lawful requisites appear, no citizen can deny the inference. If the inquiry could be extended beyond that point, and go to the fact of actual notice, it would in all cases require an examination into the capacity and degree of understanding in the party to be affected by it. For actual notice would most certainly depend rather upon the mental strength, information'and intellectual powers of the defendant, than upon the mere return of an officer upon a writ. This is not the principle, and we conceive, in the partition among heirs and devisees, the law requires notice to all who do not join in the petition, or they will not be bound by the acts of the court. 6 Wheaton, 119. It is of infinitely more consequence, that all those interested in the subject matter of the division, should be before the court ordering the allotment, than before the commissioners making it. For it is a well established principle, that the court settles the rights and respective interests of- the parties, in the first instance, and the freeholders appointed only act as ministerial officers, in laying off and ascertaining the boundaries of each share. It would be strange if the law had provided for that which was comparatively immaterial, and had left the transaction, which really fixes the whole matter, to be of an ex parte character. 1 Story’s Equity, 599; 17 Vesey’s Chan. Rep. 551.
Much reliance was placed on the confirmation by the supreme court, on appeal, of the decision of the probate court. The action of the appellate court did certainly settle the controversy between Lane and the appellees, Morse and Henderson. They can never *446 question it further, but it gave no greater extent to the judgment of the inferior tribunal, than it would have had if no appeal had been taken. It imparted to that judgment, absolute verity and full force. That verity and force were confined to the parties to it, and these defendants were in nowise.affected by it. 1 Cooke’s Rep. 211. 362.
The acts of the commissioners, therefore, viewed in any light, cannot avail the complainants in this controversy. It would require strong and undoubted authority, to induce us to regard them as of any validity whatever. Here was a case, in which the petitioners, Morse and Henderson, with their wives, on the one side, had not a particle of interest involved, as has been shown by the true construction of the will of Vick. The defendant to it, the pretended administrator, was alike a perfect stranger to the whole subject matter before the court. The result was, that the real estate of the appellants was parcelled out and divided and an important portion of it, in perpetual use, was given away to the public. And this was brought about by an ex parte proceeding, begun and carried through by persons who had not a shadow of claim, legal or equitable,to the land appropriated. It would be a reproach to the law, if such a state of facts could find a sanction under its principles. We would not yield our judicial countenance to the doctrine contended for, unless compelled to do so by authority from which we could not dissent.
There is but one point remaining for our notice. “ Has the dedication in question been made or sanctioned by the defendants?”
One of the defendants is still an infant, the other two came to the years of majority in 1327 and 1828. It is said they have recognised the dedication made by Lane and the commissioners. Those acts have been shown to be void, and of course, incapable of any recognition which could give them validity. Contracts and various other transactions, by an infant, which are voidable by reason of his non-age, may be ratified, and made operative by him, when he becomes of age. This is not prejudicial to him, and slight circumstances may be sufficient to bind him. Here the acts referred to are not anything done by the infants, but the pro *447 ceedings of strangers in derogation of their rights. 3 P. Will. 321; 9 Peters’s S. C. Rep. 607; Matt. Pres.Evi. 241. Their real estate has been conveyed away by others, and if any recognition of theirs can protect the transaction, it must be such a recognition as amounts to a release on their part, or is equal to an original conveyance of the property in question. The record shows no such acts, but proves the contrary in tlie most satisfactory manner. In 1827, the probate court, on application, directed the division contemplated in the will of Newit Vick. This was the very year the oldest of the defendants came of age. The property in question fell under this division. In 1828, the claim of the three Vicks, (defendants,) had become, every where in that region, publicly known, and in that year, and the next, they conveyed away by deed, portions of the land in controversy. In the year 1831, legal proceedings were commenced for the recovery of the “commons,” and from, that time to the present moment, their efforts in court have never ceased.
It is said their various deeds, exhibited in proof, refer to the commons and boundaries on the plat of the town. That is a circumstance of no force when it is considered that their claim was publicly known, and actually in process of litigation in the courts of the country. The plat was used mer'ely for the purposes of description, and easy and familiar reference. It could not, under the circumstances, have any further effect. There have been no acts on the part of these defendants, on which to predicate any portion of the claim set up in the bill.
As to the character in which the claimants assume to act. They refer to the statutes, incorporating the town of Vicksburg, as investing them with the authority to protect and secure the interests of all the citizens. The first act passed in 1825, is very vague, and it is by no means clear, that 'its terms would include any part of the commons or Levee street. The act of 1827 is distinct upon that head, and expressly adopts the plat returned to the probate court, by the commissioners in 1824. Among themselves the inhabitants of Vicksburg doubtless acquired an aggregate existence or character, by the statutes referred to. .The enactments of the legislature did nothing, and could do nothing, to *448 aid the inherent defect in their titles. With the exception of the single purchaser from Newit Vick, they all come upon the spot by virtue of the tortious proceedings of Lane and the commissioners. They were, indeed, an aggregate corporation, or body politic, but so far as these defendants are concerned, they held their position by act of disseisin, and intrusion upon their inheritance. From this point in the case, let us now look back to the supposed dedication by Newit Vick, and for a moment, consider it as actually having been made by him. i How clearly and fully< does it appear, that these complainants, thus situated, can never be considered the public, to whom the easement was granted? They cannot connect themselves with the grantor, by any privity of contract, or mutual assent, so as to give any pretence of a right to be regarded as the favored objects of his bounty and regard. Their situation alone is a complete answer to their claim.
We have thus examined all the points deemed necessary to enable us to come to a conclusion on the appeal before us. We have given to the complainants the full benefit of all the testimony in the whole volume of the record, although a part of it was of an equivocal character, and some portions which were objected to, were probably inadmissible, according to the strict, technical rules on the subject. It has been all looked into and noticed, and although the facts of the cause are so different from any to be found in the books, that we should have felt warranted in deviating from some of the rules of adjudicated authority, if it had been necessary, or even in establishing a new rule, founded upon the settled doctrines and analogies of law; yet our examination has been chiefly limited to a dry and rigid investigation of the reported decisions; and we are perfectly satisfied that the claim set up by the complainants, as against these defendants, has no foundation in law or equity.
It has been suggested that disastrous consequences might flow from a decision, contrary to that made by the chancellor. We see no reason for any well grounded apprehension on that score. At all events, such considerations can have no influence here. Judicially we cannot regard them. Our duties begin and end *449 with the case before us. Our vision is bounded by the record and the law.
We entertain no doubt that the decree of the chancery court should be reversed. We have, therefpre, directed the injunction, originally granted in the cause, to be dissolved, and the bill dismissed at the cost of the appellees.
Decree accordingly.