# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-01695-SCT

*RALPH H. McBROOM AND GERALDINE E. McBROOM*

*v.*

*JACKSON COUNTY, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/18/2012 |
| TRIAL JUDGE: | HON. JAYE A. BRADLEY |
| TRIAL COURT ATTORNEYS: | ROBERT E. O'DELL |
| | GARY S. EVANS |
| | ANGELA BROUN BLACKWELL |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ROBERT E. O'DELL |
| ATTORNEYS FOR APPELLEE: | GARY S. EVANS |
| | ANGELA BROUN BLACKWELL |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | REVERSED AND RENDERED - 10/02/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., KITCHENS AND CHANDLER, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     In 1972, the Board of Supervisors of Jackson County, Mississippi, approved the final plat for Spring Lake Subdivision. At that time, the sole means of vehicular access to the subdivision was Spring Lake Drive East, which crossed Spring Lake Dam. The McBrooms, who own Spring Lake, three subdivision lots on Spring Lake, and the dam forming the lake and providing access to the subdivision, contend that Jackson County is obligated to maintain the dilapidating roadway by virtue of the McBrooms' dedication of the roadway to public use and Jackson County's acceptance of their dedication. The Chancery Court of Jackson County

held that the McBrooms were entitled to no relief. Finding that the Spring Lake Dam and the roadway over it were dedicated to public use and accepted by Jackson County under the common law of this State, as evidenced by more than thirty years of continuous use by the public, we reverse and render judgment for the McBrooms.

## FACTS AND PROCEEDINGS BELOW

¶2. Ralph McBroom purchased two lots on the east side of Spring Lake in the Spring Lake Subdivision in 1972 and a third lot in 1989. He built a home on the lots in 1986 and moved in with his wife Geraldine in 1987. The residence is situated on the lake to the immediate left of Spring Lake Drive East, a paved roadway which crosses the entire length of the Spring Lake Dam traveling east. It was undisputed at trial that, for thirty-four years, from 1972 until an alternate means of access to the Spring Lake Subdivision was constructed by Jackson County in 2006, the roadway over Spring Lake Dam provided the only means of ingress and egress to and from the subdivision: "the garbage man, the mailman, everyone, UPS man. They all–well, matter of fact, he still comes over that thing. But no one had any problems with the road," as Ralph McBroom testified.

¶3. Nevertheless, at the time the subdivision was developed in 1972, the Jackson County Board of Supervisors approved the final subdivision plat for the Spring Lake Subdivision but added to it the following unilateral statement: "subject to the condition that the developer perpetually maintain the entrance route into said subdivision along the dam and subject to the express condition that Jackson County does not accept said entrance route over the dam for maintenance." In 1980, Lake-O-Pines, Inc., conveyed, by warranty deed, property

2

including Spring Lake and Spring Lake Dam to Smith Homes, Inc. The warranty deed contained the following stipulation:

> It is expressly understood and agreed that the Grantor herein has the responsibility of repairing the dam for Spring Lake and to have such repair completed by August 1, 1980. Upon acceptance of such repair work by the Board of Water Commissioners of the State of Mississippi, the grantee shall assume the responsibility of maintenance of said dam at Spring Lake.

Notably, this instrument is silent with respect to the paved roadway atop the dam. After multiple conveyances of the property since 1980, Merton Larson purchased Spring Lake, including Spring Lake Dam, in 2003 by quitclaim deed. In 2005, Larson conveyed the lake and dam to his company, Project Systems Investment Corporation.

¶4. In 2006, the Spring Lake Dam and roadway had deteriorated to such a degree that the local school buses, which historically had utilized the dam for ingress and egress to and from the Spring Lake Subdivision, were prohibited by the County School Board from crossing the dam. That year, the county opened an alternate access into the subdivision, namely Lee Taylor Road. On March 13, 2006, the McBrooms filed a complaint in the Chancery Court of Jackson County against Jackson County, Jackson County Planning Commission, Mississippi Department of Environmental Quality, Merton Larson, and Project Systems Investment Corporation.

¶5. According to the McBrooms' complaint, the Mississippi Department of Environmental Quality (MDEQ) had placed "Larson on notice that the dam is [a] 'high hazard dam' pursuant to the laws of the State of Mississippi and that the same must be either repaired, or breeched [sic], and the lake drained." The McBrooms alleged that "Jackson County, acting through its Board of Supervisors, now refuses to continue its traditional

3

maintenance of the road across the dam based upon the belief that the road across the dam is a private road." The McBrooms sought an injunction against Jackson County to require the Jackson County Board of Supervisors "to take immediate steps to restore the dam and to restore the road that traverses the top of the dam to a safe and reasonable condition for ingress and egress of the Plaintiffs and property owners in Spring Lake Village [Subdivision] . . . " or to require that Larson effect those repairs. The complaint further sought an injunction to prevent MDEQ and Larson from breaching the dam.

¶6.     MDEQ filed a Motion to Dismiss, arguing that the McBrooms had failed to exhaust administrative remedies. The Jackson County Planning Commission likewise filed a Motion to Dismiss, asserting that, having "no separate legal existence apart from Jackson County," it was "not a legal entity capable of suing and being sued" and therefore not a proper party. In an order dated May 15, 2006, the chancellor  granted the Jackson County Planning Commission's Motion to Dismiss and, because the McBrooms agreed to pursue administrative remedies, continued MDEQ's Motion to Dismiss. Those administrative remedies involved the McBrooms' obtaining a dam-breach analysis and a survey and field verification report. The results of those reports led to a reclassification by MDEQ of Spring Lake Dam "as a low-hazard dam." According to the letter the McBrooms received from MDEQ, "[o]wners of low-hazard dams are not required to develop and maintain an Emergency Action Plan (EAP) nor are they required to have their dam inspected by an engineer."

¶7.     The chancellor then dismissed Merton Larson and Project Systems Investment Corporation with prejudice because a settlement had been achieved. The record reflects that

4

on May 11, 2006, the McBrooms had purchased by quitclaim deed Spring Lake (and the accompanying dam and roadway) from Project Systems Investment Corporation.

¶8. Following further investigations and the filing of two amended complaints by the McBrooms, a trial was held in August 2012. The McBrooms' Second Amended Complaint, against Jackson County only, sought a declaratory judgment that the Spring Lake Dam and the roadway over it had been dedicated to public use and accepted by Jackson County and that the Jackson County Board of Supervisors' 1972 statement, in the final plat approval, that the developer maintain the dam, was an act *ultra vires*, which is to say, beyond its legal authority. The McBrooms sought, in the alternative, recognition that Jackson County either was responsible for maintaining the dam and roadway by virtue of a public easement or by adverse possession. Additionally, they sought compensatory damages and attorney fees. Both parties submitted Proposed Findings of Fact and Conclusions of Law. On September 18, 2012, the chancellor issued her "Findings of Fact, Conclusions of Law, Ruling and Judgment of the Court" holding that the McBrooms were not entitled to any of the relief sought.

¶9. Aggrieved, the McBrooms timely appealed the chancellor's judgment to this Court on October 4, 2012. They raised the following issues:

1. Whether the trial court erred in not finding that there was an actual, or "statutory," dedication and acceptance by Jackson County of the roadway over Spring Lake dam, including whether Jackson County's purported exclusion of maintenance responsibility for Spring Lake Drive East over Spring Lake dam by resolution was unlawful.

2. Whether the trial court erred in not finding that there was an implied, or "common law," dedication and acceptance to Jackson County of the disputed roadway, so as to create a public easement.

5

3.    Whether the trial court erred in not finding the existence of an easement or right-of-way by prescription in favor of public ownership of the disputed roadway by Jackson County.

4.    Whether the trial court erred in not awarding injunctive relief ordering Jackson County to provide maintenance to the roadway and substrate dam.

5.    Whether the trial court erred in not awarding the plaintiffs attorney fees and costs of court.

Finding the McBrooms' other contentions to be without merit, we address only their first two assignments of error.

## DISCUSSION

**Whether the chancellor erroneously concluded that Jackson County was not obligated to maintain Spring Lake Drive East over Spring Lake Dam by virtue of statutory and common law dedication and acceptance.**

¶10.    The McBrooms claim that continuous public use of Spring Lake Drive East, the sole means of vehicular access to the Spring Lake Subdivision from 1972 through 2006, evidences intent of the subdivision developer at the time the plat was approved to dedicate the access roadway to public use, notwithstanding Jackson County's attempted refusal in the final plat to accept the roadway. The McBrooms further argue that Jackson County's acceptance of the Spring Lake Subdivision final plat with the directive that the "developer perpetually maintain the entrance route into said subdivision along the dam" constituted an *ultra vires* action. Jackson County counters that the roadway over Spring Lake Dam was not included in the legal description of the plat and that, while the county specifically did accept the roads included within the plat's legal description of the subdivision, the roadway over Spring Lake Dam was not included among those roads accepted. The chancellor found that,

6

at the time of trial in 2012, the McBrooms were the fee simple owners of the Spring Lake Dam and roadway and that, in 1972, Jackson County had not acted *ultra vires* by conditioning acceptance of the final plat on the developer's maintenance of the dam and roadway.

¶11.　The findings of fact of a chancellor "will not be disturbed unless manifestly wrong or clearly erroneous." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (Miss. 2009) (quoting *Sanderson v. Sanderson*, 824 So. 2d 623, 625 (Miss. 2002) (quoting *Consol. Pipe & Supply Co. v. Colter*, 735 So. 2d 958, 961 (Miss. 1999))). However, "the Court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard." *Lowrey*, 25 So. 3d at 625 (quoting *Owen v. Owen*, 928 So. 2d 156, 160 (Miss. 2006)). "A chancellor's conclusions of law are reviewed de novo." *Lowrey*, 25 So. 3d at 625 (citing *Chesney v. Chesney*, 910 So. 2d 1057, 1060 (Miss. 2005)).

¶12.　This Court has defined "dedication" as "the setting aside of land for public use." *Nettleton Church of Christ v. Conwill*, 707 So. 2d 1075, 1076 (Miss. 1997). Private land may be dedicated to public use in two ways, pursuant to statute and under the common law. *Conwill*, 707 So. 2d at 1076 (citing *Dedication* 23 Am. Jur. 2d § 3). According to this Court, "[t]wo distinctions separate the different types of dedication." *Id.* "First, the common law dedication operates by way of an equitable estoppel, whereas a statutory dedication operates by way of grant. Second, a common law dedication usually creates a mere easement, whereas in a statutory dedication the fee of the property is in the public." *Id.*

　　A.　*Statutory Dedication*

7

¶13.    Mississippi Code Section 21-19-63 (Rev. 2007) sets forth a mechanism by which land may be dedicated to public use by plat:

> In all cases where a map or plat of the subdivision is submitted to the governing authorities of a *municipality*, and is by them approved, all streets, roads, alleys and other public ways set forth and shown on said map or plat shall be thereby dedicated to the public use, and shall not be used otherwise. . . ."

(Emphasis added.) We agree with the McBrooms that the dam appears on the final plat map of the Spring Lake Subdivision accepted by the Jackson County Board of Supervisors in 1972. But we find that Section 21-19-63 applies by its plain language to municipalities, not to counties. As we previously have held, "[t]he courts have no right to add anything to or take anything from a statute, where the language is plain and unambiguous. To do so would be intrenching upon the power of the Legislature." *Wallace v. Town of Raleigh*, 815 So. 2d 1203, 1208 (Miss. 2002) (quoting *Hamner v. Yazoo Delta Lumber Co.*, 100 Miss. 349, 56 So. 466, 490 (1911)).

¶14.    Nevertheless, the McBrooms maintain that Mississippi Code Section 17-1-23(3) (Rev. 2012) provides a counterpart to Section 23-19-62 applicable to counties. While we agree that the plain language of other subsections of Section 17-1-23 applies to counties, the McBrooms' interpretation of Section 17-1-23(3) again ignores the  plain language of the statute. In pertinent part, Section 17-1-23(3), which is virtually identical to Section 21-19-63, provides:

> In all cases where a map or plat of the subdivision is submitted to the governing authorities of a *municipality*, and is by them approved, all streets, roads, alleys and other public ways set forth and shown on said map or plat shall be thereby dedicated to the public use, and shall not be used otherwise . . . .

(Emphasis added.) Subsections 1, 2, and 4 of Section 17-1-23 reference the "governing authority of each municipality *or county*." (Emphasis added.) We cannot agree with the McBrooms that Section 17-1-23(3) applies to counties, notwithstanding the language of other subsections. *See* Miss. Code Ann. § 17-1-1(a) (Rev. 2012) ("'Municipality' means any incorporated city, town or village within the state."); ***COR Developments, LLC v. College Hill Heights Homeowners, LLC***, 973 So. 2d 273, 287 (Miss. Ct. App. 2008) (holding that Section 17-1-23(3) "does not govern in the present case because it applies only to municipalities, not counties.")

¶15.   Section 17-1-23(2) by its plain language applies to counties. It provides:

> The board of supervisors of any county may order that no plat of a subdivision shall be recorded until it has been approved by the board of supervisors, and the board of supervisors shall have power to require the installation of utilities and laying out of streets in subdivisions or to accept performance bonds in lieu thereof . . . .

The McBrooms argue that Section 17-1-23(2) is an enabling statute, providing a "legislative grant of authority to the board of supervisors" either to "(1) 'require the installation of utilities and laying out of streets in subdivisions' or, (2) 'to accept performance bonds in lieu thereof.'" We find the McBrooms' contentions to be without merit. Section 17-1-23(2) is, by its plain language, discretionary. First, "[a] basic tenet of statutory construction is that 'shall' is mandatory and 'may' is discretionary." ***Khurana v. Miss. Dep't of Revenue***, 85 So. 3d 851, 854 (Miss. 2012) (quoting ***Franklin v. Franklin ex rel. Phillips***, 858 So. 2d 110, 115 (Miss. 2003)). The statute gives discretion to the board of supervisors to withhold recordation of a plat of a subdivision until such time as the board approves it. Second, the statute states that the board "*shall have power to* require the installation of utilities and laying out of streets

9

in subdivisions or to accept performance bonds in lieu thereof . . . ." Miss. Code Ann. § 17-1-23(2) (emphasis added). We find that the language "shall have power to" does not *mandate* action by the county board of supervisors, but merely vests the board with the authority to act.

¶16. Section 900.1 of the Jackson County Subdivision Regulations from 1968, entitled "Performance Bond," provides the following:

> In those instances where the Planning Commission determines that it is not necessary or desirable that all required streets and other improvements be completed prior to approval of the Final Plat, a performance bond will be accepted in lieu of completion of the construction as set forth in Article V (Required Improvements) . . . .

Equating "completion" with "acceptance," the McBrooms argue in their reply brief, without citing any authority, that "[w]here there is, putatively, no acceptance of a street for maintenance by the County, a performance bond is required by the ordinance (as in accordance with the enabling statute) in order to secure future performance by the developer." Thus, according to the McBrooms, Jackson County's delegation of the obligation to maintain the Spring Lake Dam to the developer, in the absence of a performance bond securing future maintenance, constituted an *ultra vires* act by the county. We find the McBrooms' argument to be unsupported.

¶17. The ordinance requires a performance bond in lieu of construction "[i]n those instances where the Planning Commission determines that it is not necessary or desirable that all required streets and other improvements be completed prior to approval of the Final Plat." Jackson County, Miss., Subdivision Regulation 900.1 (1968). The scenario contemplated in Subdivision Regulation 900.1 remains wholly distinguishable from the facts before the Court

10

in the instant case. Here, the McBrooms presented no evidence that a determination was made by the Planning Commission that a performance bond was required in lieu of completion of the roadway over the Spring Lake Dam prior to approval of the final plat. The Jackson County Board of Supervisors conditioned the approval of the final plat on the continued maintenance of the dam and roadway by the developer of the Spring Lake subdivision. Thus, on the basis of dedication and acceptance under our statutes, we cannot say the chancellor erred in holding that the McBrooms were the fee simple owners of the Spring Lake Dam and the roadway over it. *See Conwill*, 707 So. 2d at 1076 ("[I]n a statutory dedication the fee of the property is in the public.")

¶18.   For these reasons, the Mississippi statutes pertaining to dedication of private land to public use do not support the McBrooms' position that Jackson County was obligated to maintain Spring Lake Dam and the roadway over it.

   B.   *Common Law Dedication and Acceptance*

¶19.   The statutory analysis is not dispositive, however. The common law of dedication and acceptance, which "operates by way of an equitable estoppel," also must be considered. *Conwill*, 707 So. 2d at 1076. Instead of a creating a fee interest in the public, "a common law dedication usually creates a mere easement." *Id.* We find that, while statutory dedication and acceptance are limited by plain statutory language to municipalities, the common law of dedication and acceptance can be applied more broadly to actions by counties.  *See Hearn v. Morrow*, 272 So. 2d 645 (Miss. 1973); *Armstrong v. Itawamba County*, 195 Miss. 802, 16 So. 2d 752 (1944); *Kinnare v. Gregory*, 55 Miss. 612, 1878 WL 4511 (1878). According to this Court:

11

It is well-settled law in Mississippi that land sold according to a plat or map will dedicate the streets, alleys, squares, and other public ways marked on the map or plat to the public for public use. *See, e.g., Luter v. Crawford*, 230 Miss. 81, 92 So. 2d 348 (1957); *Skrmetta v. Moore*, 227 Miss. 119, 86 So. 2d 46 (1956); *Panhandle Oil Co. v. Trigg*, 148 Miss. 306, 114 So. 625 (1927); *Indianola Light, Ice & Coal Co. v. Montgomery*, 85 Miss. 304, 37 So. 958 (1904); *City of Vicksburg v. Marshall*, 59 Miss. 563 (1882); *Briel v. Natchez*, 48 Miss. 423 (1873); *Vick and Rappleye v. Mayor and Aldermen of Vicksburg*, 1 How. 379 (Miss. 1837).

*Conwill*, 707 So. 2d at 1076. This rule has roots in the early jurisprudence of this state:

The rule has obtained general sanction, that, if the owner of urban property has laid it off into lots intersected by streets and sells the same with reference thereto, or with reference to a map or plat dividing it into squares, streets and alleys, such action will amount to a dedication of the streets and alleys to the public. *Irwin v. Lewis*, 9 How. (U.S.) 10; *Rowan v. Portland*, 8 B. Monroe, 232; *Vicks v. Vicksburg*, 1 How. 379.

*Briel v. City of Natchez*, 48 Miss. 423, 436, 1873 WL 4128 (1873). Even earlier than the 1873 *Briel* case, this Court stated that "when the owners of urban property have laid it out into lots with streets and avenues intersecting the same, and have sold lots with reference to such plat, it is too late for them to resume a general and unlimited control over the property, thus dedicated to the public." *Vick et al. v. The Mayor and Aldermen of Vicksburg*, 1 How. 379, 2 Miss. 379, 432 (1837).

¶20.    As to dedication and acceptance of roadways, this Court has opined that the landowner:

. . . may grant to certain persons or to the public the easement of a highway over his land; not that the grant is technically by deed, but he may do those acts which unequivocally manifest an intention that the community shall have and enjoy a highway on his private property. When the public accepts his offer there has been consummated that which is of equal import with a contract or grant, and there has been accomplished what is expressed by the term "dedication."

The acceptance may be shown in two ways: first, by the formal act of the proper authority competent to speak and act for the public, or it may be implied

12

from circumstances such as user,[1] etc. *The People v. Jones*, 7 Mich. 176, *Fulton v. Mehronfield*, 8 Ohio St. 440, *Briel v. City of Natchez*, 48 Miss. 436.

*Kinnare*, 55 Miss. at 620-21.

¶21.     We agree with the McBrooms that the Jackson County Board of Supervisors approved the final plat for the Spring Lake Subdivision in 1972 and that the final plat referenced the dam. The 1972 plat map approved by the Board  not only references "DAM," but also, the dam itself connects with Spring Lake Drive East. It is true that the Board sought to condition its approval of the Spring Lake Subdivision on the developer's perpetual maintenance of "the entrance route into said subdivision along the dam" and expressly stated that "Jackson County does not accept said entrance route over the dam for maintenance." But this disclaimer does not comport with the requirement of Section 404.4 of the Jackson County Subdivision Regulations of 1968 that "the subdividing of the land shall be such as to provide, by means of a public street, each lot with satisfactory access to an existing public street." And the parties do not dispute that the roadway over the Spring Lake Dam was the sole means of access into the subdivision from 1972 until Lee Taylor Road was opened in 2006.

¶22.     Because the dam provided the sole means of ingress and egress to and from the subdivision at the time of its approval, we find that the Board acted contrary to its own Subdivision Regulations in 1972 by attempting to disclaim maintenance of the roadway: Jackson County approved the plat with public streets therein and was required by its own regulations to provide a public means of access. The fact that an alternative roadway was

---

[1]The term "user" refers to "[t]he actual exercise or enjoyment of any right, property, drugs, franchise, etc." *Black's Law Dictionary* 1383 (5th ed. 1979).

13

constructed in 2006, thirty-four years after the Board approved the final plat of the Spring Lake Subdivision, is of no moment to this Court's consideration of the 1972 dedication to the public of the Spring Lake Dam.

¶23. With regard to the Subdivision Regulations, the chancellor, however, found that "Section 400.2 does not appear to require strict compliance." Section 400.2 requires the following:

> The arrangement of streets in a subdivision shall either:
>
> a.    Provide for the continuation of existing principal streets in surrounding areas; or
>
> b.    conform to a plan for area development approved or adopted by the Planning Commission to meet a particular situation where topographical or other conditions make continuance or conformance to existing principal streets impracticable.

The chancellor then cited Section 700.1 of the Subdivision Regulations, governing "Hardship and Modifications":

> [w]here the Planning Commission finds that extraordinary hardships may result from strict compliance with these regulations, it may vary the regulations so that substantial justice may be done and the public interest secured, provided that such variance will not have the effect of nullifying the intent and purpose of the regulations."

The chancellor concluded that "[t]he County was clearly vested with the power to vary its acceptance of subdivision design regulations."

¶24. We do not agree with the chancellor's determination. First, while "Section 400.2 does not appear to require strict compliance," it relaxes compliance to allow conformity to an adopted plan only "where topographical or other conditions make continuance or conformance to existing principal streets impracticable." Jackson County, Miss., Subdivision

14

Regulation 400.2(b) (1968). No conditions, topographical or otherwise, were cited by the Board to allow it to require the developer to maintain the only roadway providing a means of ingress and egress to and from the Spring Lake Subdivision. Otherwise, Section 400.2 mandates "continuation of existing principal streets in a surrounding area," the requirement which the roadway over Spring Lake Dam appears to satisfy as it provides a continuation of Spring Lake Drive East. Jackson County, Miss., Subdivision Regulation 400.2(a) (1968). Moreover, with regard to Section 700.1, the Board never made a finding, at the time of approval of the final plat, that strict compliance with Section 404.4 (requiring access to a public street) would create an "extraordinary hardship" such that a variance from the Subdivision Regulations was warranted. The chancellor's holding that the 1968 Subdivision Regulations permitted a variance under these circumstances was erroneous.

¶25. Having ascertained that a common law dedication to public use occurred, we turn to a consideration of whether there was an acceptance by the county. According to this Court, "acceptance may be shown in two ways: first, by the formal act of the proper authority competent to speak and act for the public, or it may be implied from circumstances, such as user, etc." *Kinnare*, 55 Miss. at 621 (citations omitted).

¶26. The McBrooms urge that Hurricane Frederic, in September 1979, exacted significant damage on Spring Lake Dam and the roadway over it. They cite a 1979 letter, dispatched in the aftermath of Hurricane Frederic, from Jon Bennett, Jackson County Planning Commission Director, to Charles Moore, the Governor's authorized representative of the Mississippi Civil Defense Council. Copies of the letter were sent both to E.A. Khayat, president of the Jackson

15

County Board of Supervisors, and Mel Schneider of the Federal Emergency Management Agency (FEMA), Jackson County. The letter said:

> This letter has reference to the spillway at Spring Lake Village in Jackson County which was damaged by Hurricane Frederick [sic].
>
> Please accept this letter as a request for a Damage Survey Report on this spillway, sometimes called the Lake O' Pines dam [a/k/a Spring Lake Dam]. *Even though this appears to be private property, it is a public way for use by the general public including the residents and future residences [sic] in a 48 lot subdivision, in addition to fishermen in the county.*
>
> *Jackson County did not accept maintenance of this spillway as part of the Spring Lake Village Subdivision, but the fact of the matter is that once the developer sells the lots, there is not one of responsibility to maintain the spillway. Therefore, Jackson County had no choice but to maintain this public way and has done so since it was constructed in 1973.*
>
> I hope you will be able to assist us in this matter.

(Emphasis added.)

¶27. As the chancellor noted, Michelle Coats, director of the Jackson County Planning Commission at the time of the present proceedings in 2012, testified that "[a] Damage Survey Report was what was previously used by FEMA, or by the county, to request funding from FEMA to make repairs to infrastructure damaged in a natural disaster or a declared natural disaster," for "reimbursement for repairs made to damaged infrastructure." The chancellor found that no evidence was presented by the McBrooms that Jackson County repaired the dam in the aftermath of Hurricane Frederic or received funds from FEMA as reimbursement for having done so. But, even without documentation of the actual performance of such work, the Bennett letter, quoted above, appeared on official Jackson County Planning Commission letterhead and was drafted and sent in an effort to obtain funds from FEMA, either to restore

16

the dam or to receive reimbursement for having done so. The letter acknowledged the public use of the roadway, both for the residents of the subdivision and for local fishermen and, moreover, recognized that Jackson County had maintained the roadway since its construction.

¶28. Reasonable minds may differ on the question of whether the Bennett letter rises to the level of the express acceptance contemplated by *Kinnare*, 55 Miss. at 621 (citations omitted), "by the formal act of the proper authority competent to speak and act for the public," since a county planning commission is by statute an instrumentality of the county board of supervisors. Miss. Code Ann. § 17-1-11 (Rev. 2012). Nevertheless, Mississippi Code Section 17-1-11(3) (Rev. 2012) vests the local planning commission with the authority, "in the performance of its duties," to "cooperate with, contract with, or accept funds from federal, state or local agencies or private individuals or corporations and may expend such funds . . . ." An official letter from the director of the Jackson County Planning Commission to a representative of the Governor of Mississippi, copied to the president of the Jackson County Board of Supervisors and to a FEMA official, evidences a representation by Jackson County both to federal and state authorities respecting the county's need for funds either to repair the damage to Spring Lake Dam or to reimburse the county for having done so. This cannot be seen as anything other than an overture by local government to the federal government for public monies to be used for public purposes, not private purposes.

¶29. Further, this Court has held that acceptance can be manifested by failure to assess taxes on a street. *City of Jackson v. Laird*, 99 Miss. 476, 55 So. 41, 42 (1911). In *Laird*, the City of Jackson assessed blocks and lots in the "Split addition" area for taxation, but it did not assess the streets and avenues. *Id.* One particular street, "Convent [A]venue . . . has not been

17

graded nor worked by the city, but has been used to a limited extent by the public," though other streets and avenues in the "Split addition" area had been "worked and kept in repair by the municipal authorities and used by the public." *Id.* According to the Court, "[t]hese facts constitute an acceptance by the city of the dedication to public use of the streets and avenues of 'Split addition,' including those streets and avenues which have not been graded and kept in repair." *Id.* (citations omitted). Here, Mary Ann Fontenot, from the Mapping Department of the Jackson County Tax Assessor's Office, testified at trial that the roadway over Spring Lake Dam was "[n]ot being taxed" and that it had not been taxed since she began working with the Mapping Department in 1993. Fontenot further testified that, although she was not employed with Jackson County in 1972, the maps she was examining dated back to 1972. Thus, under *Laird*, the protracted failure of Jackson County to assess real estate taxes to the Spring Lake Dam demonstrates implied acceptance by the county of its dedication to public use.

¶30. Jackson County emphasized Mississippi Code Section 65-7-4(1) (Rev. 2012), which requires counties to "prepare and adopt an official map designating and delineating all public roads on the county road system." Subsection 5 of Section 65-7-4 provides that "[t]he county road system register shall have priority in case of conflict between the register and the official map." Citing an opinion of the Mississippi Attorney General, Jackson County argued that this provision clarified which roads were county roads and which roads were not county road for the purpose of maintenance. The chancellor agreed, finding that, "[a]lthough the Court finds the absence of taxes and inclusion of the roadway on the county road map index relevant," the statute "clearly grants the county road register priority." But the issue is not a "conflict

18

between the register and the official map," to which Section 65-7-4(5) applies. What is at issue is whether the failure of Jackson County to tax the roadway and the Spring Lake Dam for more than three decades supports a finding of an implied acceptance under the common law of this State.[2] We find that it does. *See* **Richardson v. Warwick**, 8 Miss. 131, 137 (1843) ("An act of the legislature, in derogation of the common law, is strictly construed, and is carried no farther than the words of the act carry it, and the remedy is always within legislative control.")

¶31.    Likewise, Jackson County recites that "it is settled in our state that mere user by the public, without more, is not sufficient to constitute an implied acceptance." **City of Columbus v. Payne**, 155 Miss. 170, 124 So. 269 (1929). Jackson County contests the sufficiency of evidence presented by the McBrooms to support a finding of Jackson County's acceptance of the dam's dedication to public use. But, not only did the public use the roadway over Spring Lake Dam for more than thirty years as the sole means of ingress and egress in and out of the Spring Lake Subdivision; the county also represented to FEMA that it had accepted an obligation to maintain the property. Further, it is clear that Jackson County declined to assess taxes against the property since at least 1972. All support a finding that Jackson County accepted Spring Lake Dam and its roadway under the common law of this State.

¶32.    Furthermore, with regard to implied acceptance, this Court clarified that "[c]ontinued user when taken in connection with the working of the road for nearly twenty years at public

_____

[2]Further, Section 65-7-4, which went into effect on July 1, 1998, required adoption of an official map "[o]n or before July 1, 2000." The statute would have no relevance to an analysis of common law dedication and acceptance of a purported county road constructed in 1972.

expense should be deemed to have been a sufficient acceptance." ***Armstrong v. Itawamba County***, 195 Miss. 802, 16 So. 2d 752, 757 (1944). In ***Armstrong***, this Court sustained an injunction against the Armstrongs, who had erected a gate in an effort to obstruct a road that Itawamba County claimed to have been dedicated to public use and had accepted. ***Id.*** at 758. The Court noted that "it does not appear that such traveled route has ever been designated as a public road by an order of the board of supervisors, so far as may affirmatively appear from the minutes of the board," but that the evidence showed "that the roadway in question was used as a neighborhood or settlement road and worked by the local citizens of the community, when worked at all, for many years prior to 1924, and thereafter at public expense continuously until the year 1941, when such obstructions were placed therein . . . ." ***Id.*** at 753.

¶33.    Likewise, in the 1973 case of ***Hearn v. Morrow***, this Court held that a private road was dedicated to public use and accepted by the Rankin County Board of Supervisors where

> the roadway has been used by school buses and the lot owners; the road has been maintained by Rankin County by the installation of 13 culverts on the road; north of the roadway water and electric lines have been installed and south of the roadway a telephone line has been installed for the use of the property owners, all of the utility lines being within the 50 foot right-of-way designated by the plat; at the time of the trial two homes and five trailers were located on lots sold by the appellees; the lot owners, other than appellants, were using the road with no restrictions; an additional 228 acres was to be developed utilizing such road and from a *totality of the circumstances* shown by the proof in this case appellees manifested an intention for the public to have and enjoy a highway on their property.

***Hearn v. Morrow***, 272 So. 2d 645, 647 (Miss. 1973) (emphasis added). The Court held that "a public road was established by implication from the circumstances shown by the evidence in this cause . . . ." ***Id.***

¶34. Here, Ralph McBroom testified without contradiction that the roadway crossing Spring Lake Dam was utilized by members of the public as the sole entry to the subdivision, at least until the 2006 construction of the Lee Taylor Road: "the garbage man, the mailman, everyone, UPS man. They all–well, matter of fact, he still comes over that thing. But no one had any problems with the road." He further testified that the Spring Lake Dam "was mowed. It was kept clean. And I assumed someone did it and I assume it was the county." McBroom then stated, "I saw one person that was maintaining it one time and he was on a Jackson County truck, pulling one of those lawn mowers and he was mowing the grass. But that's the only one that I can swear to that I ever saw mowing the grass. But nevertheless the grass was mowed by someone." However, Butch Loper, the present assistant road manager for Jackson County and previous road superintendent for the Jackson County Central Road Department, testified contrarily that he gave his road crews specific instructions not to mow the dam. The road crews "were to stop at each end of the dam." Loper testified that he utilized the dam for ingress and egress to and from the Spring Lake Subdivision, but that "county end of maintenance" road signs were on the dam at least since the early 1990s. But Loper also testified that there were county road signs and a "Slow, Children at Play" sign that "would have been put up by the county."

¶35. Geraldine McBroom testified that, from the time she and Ralph moved into their new home in 1987, she gardened a great deal outside and, like her husband, saw Jackson County personnel in Jackson County vehicles maintaining the dam. She stated that she saw Jackson County personnel cutting the grass "[w]ith a mower, with a side mower, and may have, on occasion, come with just the straight mower. I never had to really worry about the–outside our

21

property because they kept it mowed." She testified further that the county once filled in pot holes along the roadway over Spring Lake Dam. Joe Neal, the current Jackson County road manager and former Jackson County West Division road superintendent, testified also that, some time between 2001 and 2002, "[o]ne of our crews accidentally patched some potholes" in the roadway over Spring Lake Dam. With regard to the county's placement of "county end of maintenance" signs, Neal testified that "[t]he only signs I saw were some that were posted up, I don't know, maybe a year ago that said the county didn't maintain this section of the roadway."

¶36. That Jackson County regularly maintained the roadway over Spring Lake Dam was contested at the bench trial. The chancellor held "the McBrooms' testimony regarding isolated incidents of maintenance by the County to be insufficient to prove implied acceptance by the County." The evidence presented by the McBrooms that Jackson County at least once had mowed the Spring Lake Dam, had erected county signs along the dam's roadway, and once had filled in a pothole on the roadway, alone, is too attenuated to warrant a finding of implied acceptance by the county. But that evidence, viewed in conjunction with the Jackson County Planning Commission's letter to FEMA in which it acknowledged maintenance responsibility for the dam and its roadway and the testimony that the dam never was taxed by the county, preponderate in favor of a finding of an implied acceptance by the county under the common law of this State. All essential public services, including mail services, fire, police, and anyone else desirous of entering or departing the Spring Lake Subdivision, were required for more than thirty years to use the roadway over Spring Lake Dam. Further, roads approved, accepted, and maintained by the county *within* the Spring Lake Subdivision were accessed by

22

county vehicles and work crews via the roadway over Spring Lake Dam.[3] Considering the totality of the circumstances, we find that "a public road was established by implication from the circumstances shown by the evidence in this cause . . . ." *Hearn*, 272 So. 2d at 647.

¶37.    We agree with the dissent that "the chancellor had *all* of this evidence in front of her, as well as the benefit of observing the parties during the trial." (Emphasis in original.) But in *Skates v. Bryant*, the only case upon which the dissent relies to support its position, this Court held that the chancellor committed no manifest error in finding that no common law *dedication* had occurred, since "there was absolutely *no evidence* that George Bryant intended to *donate the road to public use* or to benefit the public in any way. The road was intended to be used by the residents of the trailer park, a restrictive group of people, not the public in general." *Skates v. Bryant*, 863 So. 2d 907, 911 (Miss. 2003) (emphasis added). Here, ample evidence was adduced that the land had been *both* dedicated to public use *and accepted* by Jackson County, but the chancellor's analysis did not take into account the common law of dedication and acceptance.

¶38.    We do not fault the chancellor for her findings of fact; but the application of the common law of dedication and acceptance constitutes a question of law, subject to *de novo* review by this Court. *See Lowrey*, 25 So. 3d at 625 (citing *Chesney*, 910 So. 2d at 1060). The chancellor held that "the McBrooms' testimony regarding isolated incidents of maintenance by the County" was "insufficient to prove implied acceptance by the County," since "Miss.

---

[3]Jackson County's brief states that "while the county accepted the roads within the legal description of the subdivision, when they approved the plat, they did not accept the roadway over the dam."

Code Ann. § 65-7-4 mandates that the county road register shall have priority." With utmost respect to the learned chancellor, that analysis does not appear to have taken into account the common law of dedication and acceptance. As we stated above, Section 65-7-4 applies to a "conflict between the register and the official map," a scenario inapposite to the present one. The chancellor thus erred as a matter of law.

¶39.    While the chancellor correctly concluded that Jackson County was not obligated to maintain the roadway over Spring Lake Dam by virtue of the dedication statutes, the chancellor erred by not finding that Jackson County was so obligated under the common law of dedication and acceptance.

## CONCLUSION

¶40.    Spring Lake Dam and the roadway over it were dedicated to public use and accepted by Jackson County in accordance with the common law of this state. Finding that the Chancery Court of Jackson County erred in not so finding, we reverse the trial court's judgment and render judgment for the McBrooms.

¶41.    **REVERSED AND RENDERED.**

   **WALLER, C.J., DICKINSON, P.J., CHANDLER, KING AND COLEMAN, JJ., CONCUR.   LAMAR, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J.  PIERCE, J., NOT PARTICIPATING.**

   **LAMAR, JUSTICE, DISSENTING:**

¶42.    This Court will not reverse a chancellor's decision unless her findings were "*manifestly wrong or clearly erroneous*." **Skates v. Bryant**, 863 So. 2d 907, 911 (Miss. 2003) (emphasis added).  And "[t]his standard [applies] *even when conflicting evidence was presented by the parties*." **Id.**  (emphasis added).

24

¶43. The chancellor's findings of fact and conclusions of law are, in my view, very thorough and supported by law. The majority spends nine pages of its opinion eking out evidence (on behalf of the McBrooms) that purportedly shows that Jackson County "accepted" their dedication of their land. Among the evidence relied on by the majority is a letter from 1979 that states that "Jackson county did not accept maintenance of this spillway as part of the Spring Lake Village Subdivision . . . ." Yet, despite this clear language, the majority takes the phrase "Jackson County had no choice but to maintain this public way" as evidence that Jackson County affirmatively had accepted the McBrooms' dedication. The majority also places much emphasis on Jackson County's decision not to tax the roadway, finding that this decision "demonstrated implied acceptance."

¶44. But the problem with this analysis is that the chancellor had *all* of this evidence in front of her, as well as the benefit of observing the parties during the trial. She issued a well-reasoned opinion supported by the law, finding it "clear that Jackson County has never formally recognized the roadway over the dam as a county road or public easement." This Court is not to reverse her unless she committed manifest error, even in the face of conflicting evidence. In my view, the majority has taken great pains to highlight all of the evidence favorable to the McBrooms and ultimately substituted its own judgment for that of the chancellor in its finding of "implied acceptance."

¶45. I must also address the majority's statement that "the chancellor's analysis did not take into account the common law of dedication and acceptance." I frankly do not know how the majority can reach the conclusion that the chancellor did not "take into account" common-

25

law acceptance.[4] At the conclusion of the trial, the chancellor requested that both parties submit proposed findings of fact and conclusions of law. The McBrooms' proposed findings of fact and conclusions of law included two pages detailing the doctrine of common-law dedication and acceptance, along with the evidence they thought supported its application in this case. I do not see how the majority can so easily conclude that the chancellor did not consider this argument.

¶46. On the contrary, the chancellor's own findings indicate that she did consider it. In her Judgment, the chancellor noted that "[t]he Mississippi Supreme court has stated that a public road may be created by prescription, *dedication or* pursuant to *statutory provisions*." (Emphasis added.) And later on in her Judgment, the chancellor specifically stated that "[t]he Court has already found that Jackson County *never formally or impliedly accepted* the roadway over the dam." (Emphasis added.) It is clear to me that the chancellor considered the common-law dedication theory and rejected it.

¶47. And finally, if the majority's sole reason for reversal here is the chancellor's failure to "take into account" common-law acceptance (as quoted above), then the proper remedy is to reverse and remand with orders for the chancellor to do so, instead of making findings of fact based on disputed evidence and rendering judgment in favor of the McBrooms. For these reasons, I respectfully dissent.

**RANDOLPH, P.J., JOINS THIS OPINION.**

---

[4]To be clear, everyone agrees that the McBrooms dedicated their property to public use and that the only real issue is whether Jackson County accepted it.